73911. EVANS v. THE STATE.
73912. JOINER v. THE STATE.
(359 SE2d 174)

POPE, Judge.

Bobby James Evans and Willie Terry Joiner bring these appeals from their convictions and sentences of burglary. *Held*:

*Case No. 73911*

1. Defendant Evans first enumerates as error the trial court's denial of his motion to sever the trial of his case from that of his co-defendant Joiner. The basis of Evans' claim for severance is that his defense was antagonistic to that of his co-defendant. See generally *Murphy v. State*, 246 Ga. 626 (2) (273 SE2d 2) (1980). This claim is based on the fact that each defendant denied knowledge of the garbage bag full of stolen cartons of cigarettes found in the car in which they were riding. Joiner (the driver) claimed he picked up hitchhiker Evans (the passenger) near the burglarized premises with the subject bag of loot, and Evans claimed that the bag of cigarettes found under his legs was already there when he got in the car.

"The grant or denial of a motion to sever is within the sound discretion of the trial court and the ruling thereon will not be disturbed unless there is an abuse of discretion. [Cits.] . . . The defendant seeking severance must do more than raise the possibility that a

separate trial would give him a better chance of acquittal. He must make a clear showing of prejudice and a consequent denial of due process." *Murphy*, supra at 629. "The fact of antagonistic defenses does not of itself require severance, [cits.], and [Evans] has not demonstrated any clear prejudice and denial of due process which might have been avoided by severing the trials." *Kennedy v. State*, 253 Ga. 132, 135 (317 SE2d 822) (1984); *Everett v. State*, 238 Ga. 80, 81 (230 SE2d 882) (1976); *Kirby v. State*, 174 Ga. App. 58 (2) (329 SE2d 228) (1985). Accordingly, we find no abuse of discretion in the trial court's denial of Evans' motion to sever.

2. Evans next cites as error the trial court's denial of his motion to suppress evidence obtained as the result of the stop of the car in which he was a passenger. He contends that the police officer had no reason to stop the car.

The evidence showed that at approximately 12:45 a.m. on January 27, 1986 Officer Christian, while on patrol in northwest Atlanta, received notice that a tack alarm[1] had been set off at a nearby convenience store. Due to past break-ins at this and other convenience stores in the area, the officer had checked the subject premises approximately 10 minutes earlier and had found everything in order. He then had proceeded to a gasoline station just up the street from the convenience store. Upon receipt of the alarm, the officer pulled out of the gasoline station, looked in all directions, and observed two occupants in a yellow 1969 Plymouth Satellite coming up the hill toward him, approximately 1,000 yards past the subject convenience store. There was no other person or car in sight. The officer proceeded to the convenience store and observed the glass in the front of the premises had been knocked out and cartons of cigarettes were laying in the parking lot. The officer immediately left the premises and began following the yellow Plymouth. When he obtained appropriate back-up assistance, he stopped the car. As he walked up to the driver's side of the car, he observed in plain view passenger Evans with his legs over the top of a garbage bag; one cigarette carton was observed partially coming out from under Evans' leg. Defendants were arrested and the bag of cigarettes seized.

Officer Christian offers the following reasons for stopping defend-

---

[1] The record discloses that a tack alarm "is basically . . . a motion detector device that is put inside within so many feet of the front entrance of the store. It looks like an exaggerated microphone and it is pointed down at the front of the business on the inside and it scans the front area. Any movement that comes through that front area of a business, regardless of the type of business, when entrance is made the motion is detected by the device itself and it emits a radio signal. That radio signal is received by a receiving unit which is located . . . downtown in the [special operations] precinct which is manned . . . 24 hours a day by a police officer. And when the signal goes off, he then dispatches to the appropriate zone wherever these tack alarms are located."

ants' car. Most burglaries of the type committed in this area happen extremely quickly, and the officer thought that his only chance to apprehend the perpetrators would be if they were in the immediate vicinity. At the time the officer received the alarm, he had a clear view of the area ("I could see a great distance") and observed no persons or vehicles in the area except for defendants in the older model yellow Plymouth driving away from the burglarized premises. It was after midnight on a snowy evening and no businesses were open in the area. The yellow Plymouth was nearly identical to one described in a "lookout" the officer had received earlier from another officer regarding a possible suspect of other break-ins in which cigarettes were stolen.

"Although an officer may conduct a brief investigative stop of a vehicle, see *Delaware v. Prouse*, 440 U. S. 648 (99 SC 1391, 59 LE2d 660) (1979), such a stop must be justified by specific, articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct, *Terry v. Ohio*, 392 U. S. 1, 27 (88 SC 1868, 1883, 20 LE2d 889, 909) (1968); *United States v. Brignoni-Ponce*, 422 U. S. 873 (95 SC 2574, 45 LE2d 607) (1975). Investigative stops of vehicles are analogous to *Terry*-stops, *Terry*, supra, and are invalid if based upon only 'unparticularized suspicion or "hunch," ' 392 U. S. at 27 (88 SC at 1883, 20 LE2d at 909)." *United States v. Smith*, 799 F2d 704, 707 (11th Cir. 1986). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity. [Cits.]" *United States v. Cortez*, 449 U. S. 411, 417 (101 SC 690, 66 LE2d 621) (1981).

"Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances — the whole picture — must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

"The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions — inferences and deductions that might well elude an untrained person.

"The process does not deal with hard certainties, but with

probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain commonsense conclusions about human behavior; jurors as factfinders are permitted to do the same — and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

"The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio,* supra, said that '(t)his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence.' Id., at 21, n 18. . . ." (Citations and emphasis omitted.) *Cortez,* supra at 417-418.

The application of the above-stated legal principles to the facts of the case at bar clearly demonstrates that Officer Christian had sufficient "articulable suspicions" to authorize a brief investigative stop of defendants. See *State v. Carter,* 240 Ga. 518 (242 SE2d 28) (1978); *Coley v. State,* 177 Ga. App. 669 (1) (341 SE2d 9) (1986); *State v. Turntime,* 170 Ga. App. 740 (1) (318 SE2d 157) (1984); see also *Chumbley v. State,* 180 Ga. App. 603 (349 SE2d 823) (1986). Accordingly, we find no error in the trial court's denial of Evans' motion to suppress.

3. Evans' third enumeration cites as error the trial court's ruling that there had been no systematic exclusion of blacks by the State during jury selection. The basis for this enumeration is the recent United States Supreme Court opinion in *Batson v. Kentucky,* 476 U. S. ____ (106 SC 1712, 90 LE2d 69) (1986), holding that "[a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried, [cit.], the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 90 LE2d at 82-83. The record discloses that this issue was raised by the trial court sua sponte following voir dire and was based upon the fact that the State had peremptorily struck seven black veniremen. The court also noted that defendants (who are black) struck four black veniremen and that the jury empaneled was comprised fo five black jurors, seven white jurors and one black alternate juror. The court inquired of defendants if they had any challenge to the composition of the jury. Neither defendant raised any specific objection in this regard, but counsel for

Evans "noticed that four or five of these seven blacks that were stricken by the State were in fact young or fairly young black males" and contended "that they were summarily stricken because they were young black males."

Assuming arguendo that a proper objection was made in this regard, see *Mincey v. State*, 180 Ga. App. 263 (349 SE2d 1) (1986); cf. *Ford v. State*, 180 Ga. App. 807 (2) (350 SE2d 816) (1986), and also assuming arguendo that Evans made a prima facie showing of purposeful discrimination in selection of the jury,[2] we turn to the issue of whether the State has countered that showing with a neutral explanation for challenging the black veniremen in this case.[3]

The trial court found that the State struck the seven black veniremen "for legitimate reasons, peculiar to counsel and growing out of voir dire." In summary, the State struck three veniremen on the basis of their employment (unemployed or recently employed) and the remaining four veniremen because they did not appear to be particularly interested in or responsive to the selection process. In light of these legitimate reasons presented by the State and giving "great deference" (90 LE2d at 89, n.21) to the trial court's conclusion that the State's peremptory challenges were not purposefully discriminatory, we cannot say that the trial court's finding was clearly erroneous. See *United States v. Mathews*, 803 F2d 325 (7th Cir. 1986). Therefore, this enumeration provides no basis for reversal.

4. We find no merit in Evans' assertion citing as error the trial court's failure to grant a mistrial sua sponte in light of Officer Christian's testimony referring to other "break-ins." The record discloses no objection or motion for mistrial made contemporaneously with the alleged misconduct. *Garner v. State*, 180 Ga. App. 146 (1) (348 SE2d 690) (1986).

---

[2] To establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial, "the defendant first must show that he is a member of a cognizable racial group, [cit.], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' [Cit.] Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury . . . raises the necessary inference of purposeful discrimination." 90 LE2d at 87-88.

[3] "[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. [Cits.] But the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption — or his intuitive judgment — that they would be partial to the defendant because of their shared race. [Cits.] . . . Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive, or 'affirming his good faith in individual selections.' [Cit.]" 90 LE2d at 88.

5. Finally, we find no abuse of discretion in the trial court's giving the "Allen" or "dynamite" charge[4] to the jury on the second day of their deliberations and after six and one-half hours of deliberation. *Pittman v. State*, 179 Ga. App. 760 (2a) (348 SE2d 107) (1986); *Benton v. State*, 178 Ga. App. 239 (5) (342 SE2d 722) (1986).

*Case No. 73912*

6. Defendant Joiner's sole enumeration of error challenges the sufficiency of the evidence to support the verdict. Viewing the evidence presented in this case in a light most favorable to upholding the verdict, we find that any rational trier of fact could have found Joiner guilty of burglary beyond a reasonable doubt. See *Dorsey v. State*, 172 Ga. App. 39 (1) (321 SE2d 794) (1984); *Miller v. State*, 163 Ga. App. 406 (294 SE2d 614) (1982).

*Judgment affirmed. Birdsong, C. J., and Deen, P. J. concur.*

DECIDED JUNE 15, 1987 —
REHEARING DENIED JUNE 25, 1987.

*Susan E. Teaster*, for appellant (case no. 73911).
*Drew Dubrin*, for appellant (case no. 73912).
*Lewis R. Slaton, District Attorney, Joseph J. Drolet, Margaret Earls, Assistant District Attorneys*, for appellee.

[4] *Allen v. United States*, 164 U. S. 492 (17 SC 154, 41 LE 528) (1896).